NIEMEYER, Circuit Judge,
dissenting.
ABT Building Products Corp. and its subsidiary, ABTco, Inc., a manufacturer of hardboard siding, (collectively “ABT”), commenced this action against National Union Fire Insurance Company (“National Union”), for breach of an umbrella policy issued by National Union to ABT for the period January 1, 1997, through January 31, 2000. ABT claimed that National Union failed to provide a defense to it for numerous underlying actions and to indemnify it for amounts that it agreed to pay in a global settlement of those actions. The underlying actions involved allegations that defective hardboard siding produced by ABT caused damage to homes in which the product was installed during a period of over 20 years. As an excess insurer, National Union declined to defend the underlying actions or to participate in the global settlement because, it contended, ABT had not exhausted the limits of its primary insurance policies either before or after the global settlement. In its complaint, ABT alleged breach of contract and unfair trade practices under North Carolina’s Unfair and Deceptive Trade Practices Act, N.C. Gen.Stat. § 75-1.1 et seq., in support of its request for a declaratory judgment, damages, punitive damages, treble damages, and attorneys fees.
The jury returned a verdict in favor of ABT, and based on the verdict, the district court entered judgment in favor of ABT for an amount in excess of $14 million plus attorneys fees of just under $2 million. The majority now affirms that judgment by essentially rewriting National Union’s umbrella policy and ignoring the preconditions to any duty of National Union under the umbrella policy. The record in this case conclusively shows that:
(1) During the relevant period when National Union was ABT’s excess insurer, ABT had obtained three consecutive primary insurance policies from Employers Insurance of Wausau (“Wausau”) providing coverage for the payment of damage claims up to $1 million for each occurrence and supplemental payments for attorneys fees and costs, for a total amount of coverage during the period of at least, as conceded by the parties, $2 million, plus a $1 million selfinsured retention, and attorneys fees and costs.
(2) By its terms, National Union’s umbrella policy did not provide coverage to ABT until ABT had “exhausted” its primary insurance from Wausau “by payment of claims ” made against ABT.
(3) As of the date of the verdict in this case, June 25, 2004 (over four years after National Union’s policy expired), *129 ABT and its primary insurance carriers had paid out on 469 homeowners’ claims attributable to the relevant period the following amounts:
(a) $275,598 in damages, paid to the claimants;
(b) $80,012 in the costs of the replacement hardboard siding itself, paid to the claimants;
(c) $1,448,709 in attorneys fees;
(d) $234,719 in class action notice costs;
(e) $177,312 in administrative costs.
There is absolutely no evidence in the record of any more monies paid by ABT or its primary insurer in respect of homeowners’ claims made for occurrences during the relevant period of National Union’s policy, a fact that the jury confirmed in its verdict form.
Under no reasonable calculation do these numbers demonstrate that the payments made, even as late as 2004, had exhausted the primary coverage provided by Wausau to ABT, and even at this time, the pre-conditions for National Union’s coverage under its umbrella policy have not been demonstrated. Indeed, the data indicate that ABT may never have to pay claims that exhaust its primary Wausau policies for the period January 1, 1997, through January 31, 2000, the period of coverage afforded by National Union’s umbrella policy. As of 2004, the payment of damage claims covered by the primary insurance totaled just under $276,000, less than one-tenth of the underlying limits.
As will be shown herein, the majority rewrites National Union’s policy to require it to participate in defense and settlement discussions on the slim possibility that claims in the future could exhaust the primary limits of Wausau’s insurance coverage. But in doing so, the majority has done violence to the policy language; directly assaulted the longstanding expectations of the insurance industry in issuing excess policies; and erected a new, indecipherable standard for future conduct by excess insurers. I roundly dissent.
I
A
In 1992, ABT acquired the building products division of Abitibi-Price Corporation, which had manufactured and sold hardboard siding in North Carolina since 1970 for use on the exterior of mobile and stand-alone homes to protect against the elements. Beginning in 1995, numerous individual and class-action lawsuits were filed against ABT by homeowners who had purchased and installed hardboard siding manufactured by ABT and its predecessor Abitibi, claiming that “when exposed to moisture, humidity, and other normal climatic conditions, [the hardboard siding] absorbed moisture and prematurely rotted, buckled, swelled, cracked, or otherwise deteriorated.” They alleged that they had suffered damage to their homes when the siding was installed, beginning in 1974, and that the damage would continue as long as the ABT siding “remained affixed.”
ABT and the homeowner claimants entered into negotiations, beginning in 1997, and agreed to settle all of the claims through a lead class action entitled Foster v. ABTco. Inc., No. CV-95-151-M (Ala. Cir.Ct.), which had been filed in 1995. The settlement was reached and approved by the Alabama circuit court in September 2000 (the “Foster Settlement”). Under its terms, all persons who had ABT’s hardboard siding installed during the 25-year period from May 15, 1975, through May 15, 2000, released their court claims against ABT in exchange for the ability to present a limited claim for a specified sum *130 and other benefits under a claims program established in the Foster Settlement. The settlement itself created a “siding repair program” that included the right of eligible class members also to file claims for a payment by ABT of an amount specified by a “Compensation Formula.” In addition, the settlement established a new 25-year “Enhanced Warranty,” which included procedures for reviewing and compensating future claims. Finally, the settlement required ABT to pay the homeowners’ attorneys their fees and the costs of the class actions.
Before executing the Foster Settlement, ABT sought coverage for the homeowners’ claims from at least four insurers other than National Union: Firemens’ Fund Insurance Company for the period October 20, 1992, to October 20, 1993; Standard Fire Insurance Company for the period October 20, 1993, to October 20, 1994; Farmington Casualty Company for the period from October 20, 1994, to January 1, 1997; and Wausau for the period January 1,1997, to January 31,1999.
Wausau’s policies provided the insurance that underlay National Union’s umbrella policy. Wausau issued a policy to ABT for the 13-month period from January 1,1997, to January 31, 1998 (the “1997 Wausau Policy”), which did not exclude claims for defective hardboard siding. In January 1998, however, Wausau gave ABT a notice of cancellation of the 1997 Wausau Policy, indicating that in the future Wausau would exclude coverage for hardboard siding. To comply with a 90-day notice requirement for policy cancellation, Wausau issued a “stub policy” (the “1998 Wausau Stub Policy”), providing ABT coverage for the three-month period from January 31, 1998, to May 1, 1998, under the same terms as were contained in the 1997 Wau-sau Policy. When the 1998 Wausau Stub Policy ended, Wausau issued a new policy to ABT, providing coverage from May 1, 1998, to January 31, 1999 (the “1998 Wau-sau Policy”), which excluded coverage for hardboard siding claims.
Wausau’s three policies included the same general terms and conditions for the three separate periods covered. Each provided that Wausau would “pay for damages” up to $1 million for each occurrence during the policy period or $2 million in the aggregate, plus “supplementary payments” representing the costs and expenses that Wausau incurred in investigating, defending, and settling claims. The Wausau policies provided coverage limits under the following terms:
The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.
Wausau initially refused to defend ABT in the Foster litigation, and both sides filed declaratory judgment actions to determine their rights with respect to the homeowners’ claims. In November 1999, Wau-sau and ABT executed a settlement agreement, in which ABT agreed to release Wausau from its obligations under the three policies for the homeowners’ lawsuits in exchange for Wausau’s single payment to ABT of $1.5 million. There is no suggestion that at the time of settlement, any homeowners’ claims had been paid or settled. The parties, however, allocated the settlement amount to the 1997 Wausau Policy and the 1998 Wausau Stub Policy, both of which covered hardboard siding claims, assigning, through some undis *131 closed allocation formula, $1,147,058.88 to the 1997 Wausau Policy and $352,941.17 to the 1998 Wausau Stub Policy. Under the settlement, Wausau also agreed that its obligation to participate in defending the homeowners’ lawsuits extended only through July 31,1999.
While negotiating its settlement with Wausau and possible settlements with other insurers, ABT also demanded that National Union provide a defense and indemnification in the Foster litigation under its umbrella policy issued in 1997. That policy provided excess coverage during a 13-month period from January 1, 1997, to January 31, 1998, with limits of $25 million per occurrence and $25 million in the aggregate. It provided coverage for the payment of damages for “injury [to third parties] that takes place during the policy period and is caused by an Occurrence.” When ABT received the umbrella policy from National Union, it realized that the coverage period was incorrect, and accordingly it added an endorsement to extend its coverage from January 1,1997, to January 31, 2000.
In late 1997, underwriters at National Union decided to issue a new policy to ABT, notwithstanding the endorsement that had already extended coverage of ABT’s existing policy to January 31, 2000. National Union sent notice to ABT, misstating that its existing policy would expire on January 31, 1998, the expiration date of the original 1997 policy. Thereafter, National Union issued and ABT purchased a subsequent commercial umbrella policy to cover the period from January 31, 1998, to January 31, 2000. This policy increased the limits to $50 million per occurrence and $50 million in the aggregate, and it also increased the premium. Because of the existence of the endorsement in the 1997 policy, however, the parties agree that in this litigation only the amended 1997 National Union umbrella policy is controlling for purposes of reviewing coverage liability. Thus, references to National Union’s policy are to the umbrella policy that it issued on January 1, 1997, and amended by endorsement to extend to January 31, 2000.
Under the terms of its umbrella policy, National Union agreed to cover only “those sums in excess of the retained limit that the Insured becomes legally obligated to pay by reason of liability imposed by law ... because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence.” The policy defines “Retained Limit” as “the total of applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of any other underlying insurance providing coverage to the Insured.” The Schedule of Underlying Insurance listed ABT’s Wau-sau policy and its per-occurrence and aggregate limits of $1 million and $2 million, respectively.
The excess policy also provided that if the underlying insurance lapsed, National Union would “only be liable to the same extent” that it would have been if the underlying policy had been maintained and renewed without material change. Thus, in addition to at least three separate $1 million limits of coverage in the Wausau policies, National Union could act as though there was an additional $1 million in underlying coverage by virtue of the lapsed coverage provision for the period January 31, 1999, to January 31, 2000. The parties do not dispute, however, that at least $3 million was available in underlying limits from the primary Wausau policies, and the judgment entered by the district court so provides.
In addition to agreeing to indemnify ABT for “damage claims” exceeding ABT’s *132 primary insurance, the umbrella policy imposed on National Union a duty to defend, subject to the following conditions:
[National Union] shall have the ... duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:
The applicable limits of Insurance of the underlying policies in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies.
(Emphasis added).
In a letter dated December 30, 1999, after ABT had settled with Wausau, ABT requested that National Union also enter into a settlement with ABT to dispose of the claims made by homeowners against ABT arising from the Foster litigation. Initially, ABT demanded that National Union pay ABT $3 million to pay the claims that would be made under the Foster Settlement program. This proposal was based on the mistaken belief that National Union’s policy only covered the period from January 1, 1997, to January 1, 1998. When ABT’s counsel discovered that National Union also provided coverage for the period 1998 to 2000, ABT increased its demand to $5 million, claiming that the higher amount reflected National Union’s “pro-rata exposure” to the claims covered by the Foster Settlement program. The projection accompanying the letter predicted $37.8 million in future claims, of which counsel allocated $3.52 million to National Union. The basis for these sums and for the allocation was not disclosed.
In January 2000, National Union’s claims handler assigned to the ABT policy, Aimee Tersy, accompanied by Christopher Aries, who was retained by National Union as outside coverage counsel, met with ABT representatives to discuss the situation. Tersy explained that National Union required additional information to determine whether ABT had exhausted its primary insurance coverage through payment of covered claims, as required by the terms of National Union’s umbrella policy. Ter-sy also requested documentation supporting ABT’s estimates of consequential damages, as distinct from damages incurred to pay for the replacement hardboard siding itself, because National Union’s policy covered consequential damages only.
Shortly after the meeting with ABT, Aries, who was then a junior associate with Lester, Schwab, Katz & Dwyer, LLP, sent a draft letter, dated February 9, 2000 (the “Aries letter”), advising National Union of its legal options with respect to the claims made against ABT. Aries laid out three options for National Union. First, Aries advised National Union that it could settle with ABT by paying out an indeterminate sum, noting that “it is very difficult, it [sic] not impossible, to accurately value the amount of a National Union contribution, this resulting from a combination of factors, most notably the early stage of the underlying class litigations, [and] the ‘divide and conquer’ strategies used by [ABT] in keeping all its insurers separate.” Second, National Union could request further details about the settlement and explain that it “cannot evaluate its exposure on the information currently provided by the insured.” Third, National Union could deny coverage based on ABT’s failure to exhaust the limits of its primary coverage. Aries predicted that if National Union adopted the second or third options, either “the settlement of the underlying litigation will burst, whether solely on National Union’s decision not to participate, or for other reasons” or, alternatively, ABT would file a coverage action against National Union. Aries wrote that, “[i]n the *133 latter scenario, National Union would be at a distinct disadvantage, for the equities involved ... would look unfavorable upon National Union leaving its insured to ‘twist in the wind’ and accordingly a Court would not give serious consideration to our attempt to claim that the settlement amount was unreasonable.”
After independently assessing the claims against ABT, National Union rejected Aries’ advice as legally unsound, and Aries’ letter never became the position of National Union. This became obvious not only from National Union’s decision not to follow it, but also from the letter itself, which was an incomplete draft, riddled with grammatical and spelling errors. Rather than settle or deny coverage outright, on February 11, 2000, National Union refused ABT’s demand for payment, explaining that ABT had not provided the information necessary for National Union to evaluate ABT’s demand. Over three months later, on May 24, 2001, when it had received no response to its requests for information and had no new evidence of exhaustion or documentation to support ABT’s damages projections, National Union “closed” ABT’s file without a coverage determination and with no further notice to ABT.
Despite National Union’s refusal to participate in the Foster Settlement (and contrary to Aries’ prediction in his draft letter), the homeowners’ claims were settled in the Foster Settlement, which established the compensation program described above and the resulting claims procedure for damaged homeowners.
In June 2004, shortly before the jury below returned its verdicts, ABT prepared a document entitled “Foster Settlement Fees/Costs to Date (corrected June 22, 2004),” which listed all monies paid under the Foster Settlement and which was submitted to the jury. That document argued that National Union’s share of the Foster Settlement costs as of June 2004 was: $1.45 million in attorneys fees; $234,719 in class action notice costs; $177,312 in administrative costs; and $275,598 in “Foster claims paid to date.” There is no evidence that ABT paid any claims other than those paid under the Foster Settlement.
B
In June 2001, ABT filed the five-count complaint in this case, seeking (1) a declaratory judgment that National Union had a duty to defend and indemnify ABT in the Foster litigation; (2) damages for breach of contract based on National Union’s refusal to defend or indemnify ABT; (3) damages for bad faith denial and handling of claims; (4) punitive damages for National Union’s willful and wanton conduct in discharging its contractual and fiduciary duties; and (5) treble damages for unfair and deceptive trade practices that violated N.C. Gen.Stat. § 75-1 et seq. In its bad faith and unfair trade practices counts, ABT alleged that National Union “failed to acknowledge and act reasonably promptly on communications with respect to the claims at issue”; “failed to adopt and apply reasonable standards for the prompt investigation of claims asserted against [ABT]”; “failed and refused to provide coverage ... based on an unreasonable interpretation of the policy”; and “did not attempt to effectuate a prompt, a fair and equitable resolution of the claims.”
In its answer, National Union advanced the defenses that it never had a duty to defend or indemnify ABT because (1) ABT had not exhausted the limits of its primary insurance, and (2) the underlying homeowners’ claims were not based on “property damage” resulting from an “occurrence” but rather were primarily based on damage to siding itself, which the policy did not cover.
*134 Following trial, a jury returned a verdict against National Union in the amount of $2.5 million in damages for breach of duty to defend; $3.9 million in damages for unfair trade practices; and $7.5 million in punitive damages. Although the jury found that National Union made a reasonable investigation of the homeowners’ claims against ABT, it nevertheless held that National Union “misrepresented the terms of its 1997 policy for the purposes of changing National Union’s insurance coverage obligations in 1998-2000” and that ABT detrimentally relied on that misrepresentation; that National Union failed “to attempt in good faith to effectuate a prompt, fair and equitable settlement”; and that National Union’s conduct demonstrated “bad faith,” accompanied by “aggravated conduct ... that indicates a reckless indifference to the consequences.” This constituted a two-fold finding — that National Union had violated North Carolina’s Unfair and Deceptive Trade Practices Act both by misrepresenting the terms of the policy and by refusing, in bad faith to settle. The jury did not break out the damages for those two violations.
The jury found that the hardboard siding claims all flowed from a single “occurrence” under the umbrella policy, and that the peroccurrence limits thus controlled the allocation of loss among insurers.
The jury also found that National Union’s share of the Foster Settlement costs was $1,448,709 for attorneys fees, $234,719 for class action notice costs, and $177,312 for claims administration fees, totaling $1.86 million. It found that National Union was liable for 77.5% of future claims by homeowners and that 22.5% of such claims represented the cost of replacing hardboard siding. It also concluded that National Union would be liable for $378.06 for administrative costs for each future claim settled. The division of damages for future claims was made in recognition that National Union’s policy covered property damage but not replacement costs.
Acting pursuant to North Carolina’s Unfair and Deceptive Trade Practice Act, N.C. Gen.Stat. § 75-16, the district court trebled the $3.9 million damages amount returned in the verdict to $11.7 million. ABT elected to recover the trebled damages, rather than punitive damages, and the court entered judgment against National Union in the amount of $2.5 million for breach of duty to defend and $11.7 million in trebled damages for bad faith claims handling and unfair trade practices.
The district court also issued a declaratory judgment that National Union would be obligated to indemnify ABT for future Foster Settlement claims “beginning once ABT has paid Foster Settlement costs or claims attributable during the National Union coverage period equal to $3 million in underlying insurance coverage.” The court found that as of the date of the verdict, ABT had paid Foster Settlement claims of $275,598 (exclusive of the cost of siding) and $1,860,740 in attorneys fees, class action notice costs, and administrative costs falling within National Union’s coverage period. The court held that when the “claims attributable to installations during the National Union coverage period equal the $3 million, National Union would then have a duty to indemnify ABT for 77.5% of the future payments, plus $378.06 for administrative cost of each claim.”
The district court denied National Union’s post-trial motions for judgment as a matter of law, a new trial, and remittitur, and ordered National Union to pay $1,997,161 in ABT’s attorneys fees and costs.
From the district court’s judgment, totaling more than $16 million and obligating *135 National Union to pay future claims, National Union filed this appeal.
II
Under North Carolina law, which the parties agree is controlling, insurance policies are contracts interpreted according to ordinary principles of contract law. Gaston County Dyeing Machine Co. v. Northfield Ins. Co., 351 N.C. 293, 524 S.E.2d 558, 563 (2000); Brown v. Lumbermens Mut. Cas. Co., 326 N.C. 387, 390 S.E.2d 150, 153 (1990); see also N.C. Ins. Guar. Ass’n v. Century Indem. Co., 115 N.C.App. 175, 444 S.E.2d 464, 467 (1994). Thus, a court has a “duty to construe and enforce insurance policies as written, without rewriting the contract or disregarding the express language used. The duty is a solemn one, for it seeks to preserve the fundamental right of freedom of contract.” Fidelity Bankers Life Ins. Co. v. Dortch, 318 N.C. 378, 348 S.E.2d 794, 796 (1986).
An insurance company’s duty to defend is part of its contractual obligation and is defined by the language of the insurance policy. See Lumbermens Mut., 390 S.E.2d at 152. Although the duty to defend is broader than the duty to indemnify, see Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 340 S.E.2d 374, 377 (1986), North Carolina courts have joined numerous other jurisdictions in holding that an excess insurer’s duty to defend is triggered only when the limits of primary insurance have been exhausted. See, e.g., Fieldcrest Cannon v. Fireman’s Fund Ins. Co., 127 N.C.App. 729, 493 S.E.2d 658, 660 (1997) (holding that the insurer was “an umbrella” excess coverage carrier, and as such, its duty to defend could not be triggered unless and until the primary insurers’ coverage limits were paid); see also Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes 188 (5th ed. 1992) (“The traditional view is that an excess insurer is not required to contribute to the defense of the insured so long as the primary insurer is required to defend”).
The language of National Union’s umbrella policy in this case provides no different standard, obligating National Union to defend ABT in the homeowners’ hardboard claims only after the limits of the underlying insurance had been exhausted. Precisely, the language provides that National Union’s duty to defend does not arise until the applicable limits of the underlying Wausau policies “providing coverage to [ABT] have been exhausted by payment of claims to which this policy applies.” The claims to which National Union’s policy applies are claims for damages made against ABT “by reason of liability imposed by law or assumed by contract by [ABT] ... because of ... property damage ... that takes place during the Policy Period and is caused by an Occurrence.” As a “liability” policy, the National Union policy insures against claims made by others against ABT. This distinguishes a liability policy from a first-party policy, such as a fire or health insurance policy, under which the insured itself is the claimant.
In its umbrella policy, National Union had not only a duty to defend after underlying limits were exhausted, but also a duty to indemnify ABT for payments made in respect to damage claims. Again, National Union’s duty to indemnify arises only “for that portion of damages in excess of [ABT’s] Retained Limit” which is defined as the greater of either:
1. The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the Insured; or
*136 2. The amount stated in the Declarations as Self-Insured Retention as a result of any one Occurrence not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other Underlying Insurance provided coverage to the Insured.
These contractual conditions for National Union’s duty to defend and to indemnify have not been demonstrated under any hypothesis or calculation, even today. While any one of the Wausau policies provides ABT with $1 million in limits to pay homeowners’ damage claims (not including the cost of siding, which is not covered), it is undisputed that only $276,000 has been paid to such claimants. Even if we were to include the costs of siding, $80,012, which is not covered by either National Union or Wausau’s policies, only one-third of the underlying limits of one policy has been exhausted.
To escape the inevitable conclusion, the majority has ignored the specific language of the umbrella policy and lifted out of context the term “payment of claims,” which defines the precondition to coverage, in order to hold that Wausau’s $1.5 million payment in settlement of its obligations to ABT exhausted the underlying limits in National Union’s policy, even though ABT used at most $276,000 of the money to pay homeowners’ claims. Without any analysis of the policy language, the majority declares that the term “payment of claims” includes both Wausau’s $1.5 million settlement with ABT and ABT’s obligation to pay future claims. It states:
As used in the 1997 NU Policy, the term “payment of claims” is a broad one, which does not restrict the recipient or timing of the payment in question. National Union, of course, could have sought a more restrictive formulation' — • such as “payment of claims to third parties” or “payment of judgments or settlement agreements enforceable by third parties”-but it did not do so. In this case, the Wausau Settlement Payment resolved a claim presented by ABT, Wausau’s insured, in anticipation of ABT’s own impending payment of claims made by plaintiffs in the underlying actions. Nothing in the term “payment of claims” indicates that National Union and ABT intended it to include such payments. And we are neither inclined nor empowered to rewrite the 1997 NU Policy to reflect terms that National Union now wishes it had obtained from ABT.
This ruling is a remarkable reformation of National Union’s umbrella policy, a liability insurance policy that insures ABT for its liability to third persons. If the majority cared about the policy language, under no stretch of the imagination could it have concluded that Wausau’s payment of its settlement with ABT was the “payment of claims to which this policy applies.” The plain language required that the policy limits be exhausted by payments to injured parties in respect of their claims.
The indemnity provision, which is incorporated into the defense provision, provides coverage for “sums ... that the Insured becomes legally obligated to pay ... because of bodily injury, property damage, personal injury or advertising injury.” Naturally, the “claims to which this policy applies” are claims that fit in the categories listed. It is nonsensical to refer to sums paid to ABT in this fashion. As a liability policy, the policy clearly contemplates sums paid out by ABT, or at least on ABT’s behalf, by virtue of ABT’s legal obligation to third parties. Notably, the majority does not even quote this provision of the contract.
*137 Moreover, the underlying Wausau policy covered “bodily injury” and “property damage.” ABT suffered neither of those injuries, and so the Wausau-ABT settlement payment cannot be painted as a payment of claims to implicate the excess layer of coverage.
A fuller textual analysis, which has been traditional in this court’s interpretation of contracts, see Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 57-58 (4th Cir.1992) (“Courts are not at liberty to disregard the plain language of a plan in order to demand that the insurers provide coverage for which no premium has been paid — or ever will be — paid”), and which has not been attempted by the majority in this case, also precludes the majority’s conclusions. The general duty-to-defend provision is contained in Part II of the policy entitled “Defense.” Section A provides the duty to defend once the underlying insurance has been exhausted by the payment of claims, and Sections B and C talk about the claims referred to in that Section. Part 11(B) provides:
When we assume the defense of any claim or suit:
1. We will defend any suit against the insured seeking damages on account of bodily injury, property damage, personal injury or advertising injury even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle the claim as we deem expedient.
2. We will pay the following, to the extent that they are not included in the underlying policies listed in the schedule of underlying insurance or in any other insurance providing coverage to the insured:
* * *
b. premiums on appeal bonds required by law to appeal any claim or suit we defend, but we are not obligated to apply for or furnish any such bond;
c. all costs taxed against the insured in any claim or suit we defend.
Part 11(C) refers to “claim” similarly:
In all other instances except A. above, we will not be obligated to assume charge of the investigation, settlement or defense of any claim made, brought or proceeding instituted against the Insured.
These provisions within Part II of the policy employ the word “claim” five different times. In each case, it simply could not be more clear that “claim” is the claim of a third party against the insured and not a claim by the insured against its insurance carrier.
ABT and the majority twist this use of “claim” beyond all recognition by using the word “claim” to cover claims by the insured against the primary carrier. This simply cannot be squared with the word’s use in the rest of the “Part II Defense” provision. Indeed, the majority’s reading requires “claim” to have a different meaning in two places on the very same page of the insurance policy. The majority thus converts a traditional liability policy insuring the insured against claims made by third parties against the insured into a first-party policy in which the insured itself becomes the claimant.
The majority chastises National Union for not specifically restricting the meaning of “payment of claims” to third parties. Well, of course, contracting parties can contract their way out of arbitrary judicial interpretations of their language, and in light of today’s decision, they apparently must. But the judiciary should, as in all interpretations, attempt to give words that have been employed their fair meaning, rather than yearn for a clarity of language *138 that would eliminate the need for interpretation altogether.
This textual reading of “claims” is bolstered by the terms of the Foster Settlement agreement itself. That agreement defines “claim” as “a request for payment for Damage or for reimbursement of an Unreimbursed Repair submitted to the claims office under this Settlement Agreement.” A payment of “a claim” simply could not occur prior to the Foster Settlement, under the very terms of that agreement. Similarly, the language of the settlement between Wausau and ABT releases “claims, demands, actions, lawsuits or proceedings of every kind and nature ... against ABT ... arising from the design, manufacture, testing, marketing, warranty, and/or sale by ABT of hardboard siding.” The claims being released by that settlement are the very claims allegedly insured by Wausau and by National Union — i.e. the hardboard siding claims made by homeowners.
Nor can the $1.5 million paid by Wausau to ABT in settlement of their disputes be portrayed as an “indirect” payment of claims to third parties. The third-party homeowners may well have suffered those injuries, and payments to them, if within the coverage of insurance, would be “payments of claims” that would use up underlying insurance limits. But the $1.5 million settlement between Wausau and ABT was not paid to those injured parties; it was paid to ABT. Nor did the settlement provide that funds be set aside for the payment of injured party claims. Of course, while ABT would be enriched by the $1.5 million payment and thereby better be able to pay third-party claims as they were made, there is no evidence that the $1.5 million was in fact paid to the injured parties. Indeed, those injured parties were required by the Foster Settlement still to prove their claims using the settlement process established a year later. To the date of trial, 469 homeowners made such claims, and ABT has paid only $276,000 for damages in respect to them.
Moreover, Wausau could not exhaust its responsibilities under its primary policies simply by paying ABT for possible future claims that have not been made and might never be made. According to the majority, whether or not a nickel ever goes to actual injured claimants, National Union’s coverage is implicated once the primary insurer settles, and National Union is thus saddled with the obligation to pay for any mistakes the primary carrier makes in evaluating future liability. This interpretation runs directly counter to North Carolina law:
It is true that in each of the above cases the insurer tendered its policy limits into court and awaited determination of liability, ... while here [the insurer] paid its policy limit directly to the claimant in return for a release of the insurer. This, we believe, is a distinction without material difference. The result under both procedures, vis-a-vis the insured, is the same. The claim against the insured remains outstanding, because there has been neither a judgment nor settlement disposing of that claim.
Brown v. Lumbermens Mut. Cas. Co., 326 N.C. 387, 390 S.E.2d 150, 155 (1990) (emphasis added). Thus, the insurer in that case could not escape its duty to defend until the underlying claim had been resolved. Merely tendering its limits to the insured did not cut off its obligation. The primary insurer here, Wausau, similarly could not escape its duty to defend merely by tendering payment to the insured, and it did not even try to do so. It knew that it had an obligation to defend until its policy limits were exhausted by the payment of claims to third parties. For this reason, the underlying limits of insurance *139 could not be exhausted by the Wausau Settlement, and any obligation on the part of National Union had to await exhaustion by payment of claims to third parties.
The fact remains from any fair reading of National Union’s umbrella policy that its duty to defend does not arise until ABT has exhausted the underlying limits of $1 million for each policy by the payment of claims to the homeowners in respect to their hardboard claims, and to date that condition has not been satisfied.
Ill
Even if ABT had demonstrated that the $1.5 million settlement payment made by Wausau to ABT went to the payment of third-party claims under Wausau’s policy, it still would fall far short of demonstrating that National Union’s duty to provide excess coverage was triggered. For National Union to have a duty to defend or to indemnify, ABT must demonstrate that the underlying coverage has been exhausted for at least one of the policy periods.
The $1.5 million paid by Wausau to ABT was to discharge Wausau’s liability under at least two policies, the 1997 Wausau Policy and the 1998 Wausau Stub Policy. Because the 1997 Wausau Policy covered a period of 13 months, its $1 million per-occurrenee limit had to be exhausted twice, once for the first 12 months and once for the 13th month. As the policy itself provides:
The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.
True, Wausau and ABT could have extended the policy period stated in the declarations by amending the date of expiration to May 1, 1998, and thereby limited the application of the quoted provision to two applications of the $1 million occurrence limit. But instead they agreed to the issuance of a second policy, the 1998 Wausau Stub Policy, with a new policy number, new declarations, new premiums, and a policy period covering the period January 31, 1998, through May 1, 1998. That policy also had a $1 million per occurrence coverage limitation. It is noteworthy that both Wausau and ABT treated the 1998 Wausau Stub Policy as a separate policy for purposes of settling their coverage dispute. To exhaust the coverage under the 1997 Wausau Policy, Wausau would have had to pay claims exceeding $2 million, and to exhaust the coverage under the 1998 Stub Policy it would have had to pay claims exceeding $1 million. (This does not even address the 1998 Wausau Policy and National Union’s protection under the lapsed coverage provision of its policy).
Thus, if the $1.5 million settlement amount paid by Wausau to ABT represented a payment of claims to third parties, as required by the National Union policy in order to exhaust underlying coverage, the coverage under the 1997 Wausau Policy still would not have been exhausted. A $1.5 million payment of claims does not exhaust $2 million of coverage.
To avoid this, the majority opinion must either ignore the contractual language or rewrite it so that the 1997 Wausau Policy includes only one $l-million limitation for the entire 13 months and an additional $l-million liability for the 1998 Stub Policy, for a total of $2 million. The majority then applies the $1.5 million payment to only one of the policies to demonstrate *140 that the underlying coverage was exhausted. While it is not clear how the majority is avoiding the contractual language, it might alternatively be allocating the $1.5 million payments to the two policies in the same ratio as the settlement of the coverage dispute between Wausau and ABT did — $1,147,058.83 to the 1997 Wau-sau Policy and $352,941.17 to the 1998 Wausau Stub Policy. Because the $1.1 million amount allocated to the 1997 Wau-sau Policy was greater than the $1 million coverage, the majority holds that ABT exhausted its underlying coverage, thereby entitling it to a defense and indemnity from the National Union umbrella policy.
The majority states no basis and has no basis, however, to make such an allocation. The settlement agreement making the allocation did not do so based on when injuries were sustained, when occurrences occurred, or when claims were made. Indeed, the agreement settling the coverage dispute between Wausau and ABT states to the contrary:
Such allocations shall not be an admission that any coverage or defense or indemnity is or is not afforded by any insurance policy to which such allocation is made, nor is it an admission that any “accident,” “Occurrence,” or “property damage,” as those terms are used in any such policies, did or did not take place or potentially during the policy period of any such policy.
Moreover, ABT has never demonstrated, even up to now, the dates of occurrences for purposes of assigning homeowners’ claims to particular policies. Yet, that is precisely what it must do in order to exhaust coverage under any given policy. Each Wausau policy undertakes to pay damage claims made against ABT only if the property damage “occurs during the policy period,” and only those claims can trigger the umbrella coverage.
Finally, the majority cannot even conclude that the allocation of $1.1 million to the 1997 Wausau Policy exhausts the posited $1 million coverage for the payment of claims under that policy. Because the $1 million in coverage was a limitation for only the payment of damage claims to third parties and because the policy provided for “supplemental payments” with respect to defense costs, one would have to conclude that the $1.1 million payment al-locable to the 1997 Wausau Policy was for the payment of claims and not defense costs incurred by ABT before it settled with Wausau. Such a conclusion is both illogical and unsupported. It is illogical because the parties would not allocate $1.1 million for claims when the policy only covered $1 million in claims. Moreover, in the context of the facts of this case, it would appear that all of the $1.1 million in fact went to defense costs because at the time Wausau and ABT settled, ABT had not paid one dollar with respect to claims made by homeowners. This is confirmed by the fact that ABT paid all claims of homeowners through the claims procedure established almost a year later in the Foster Settlement. Accordingly, one would have to conclude, contrary to what the majority held, that the $1.1 million allocation made in the settlement agreement between Wausau and ABT did not even exhaust the first dollar of the $1 million limitation for the first 12 months of the 1997 Wausau Policy.
In short, the majority opinion conducts none of the analyses necessary to determine whether underlying coverage had been exhausted. Had it done so, it would necessarily have had to conclude that Wau-sau’s underlying coverage has not been exhausted, even to this date, and therefore that National Union’s duty to defend and to indemnify has not yet arisen.
*141 IV
To eliminate any possibility that National Union’s duty to defend and indemnify may have been triggered in this case, we make the extreme assumption that the entire $2.1 million in defense costs and payments of claims allocated to National Union by ABT at trial is to be applied to exhaust Wausau’s underlying insurance. At trial, ABT summarized all the payments made under the Foster Settlement that must be “charged” to National Union, indicating that they represent a pro rata amount based on National Union’s policies’ coverage of the 37-month period from January 1, 1997, to January 31, 2000. The “charges” included not only amounts paid to homeowner claimants but also for attorneys, costs, and administration, as follows:
Attorneys fees $1,448,709
Class action notice costs 234,719
Administration of claims costs 177,312
Payments to claimants 275,598
Total $2,136,338
To consider this $2.1 million sum as going toward the exhaustion of underlying insurance, we are forced to ignore the policy language contained in the underlying Wausau policies that
1) The $1 million limit in each policy is exhausted only by the payment of claims, not the payment of costs and attorneys fees which are payable in addition to the $1 million limit; and
2) each $1 million limit covers the payment of claims only for occurrences during the policy peñod.
As we have already shown, these contractual provisions limit us to consideration of only $276,000 in actual payments to claimants. Those payments, of course, do not exhaust any $1 million limit, regardless of how ABT determines which claims apply to which policies.
Generously, though, we consider the full $2.1 million sum and apply it to Wausau’s policies. Because ABT has provided no data about the dates of occurrences for a contractually-required allocation among policies, we must adopt some other method of allocation.
There are two possible methods. One is a pro rata method, whereby the claims are allocated among policy periods to see if the limits in any given period have been exhausted. See, e.g., Insurance Co. of North Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1224 (6th Cir.1980). Another is the “all sums” method, where the total limits are compared with total payouts. See, e.g., Keene Corp. v. Insurance Co. of North Am., 667 F.2d 1034, 1047 (D.C.Cir.1981). If the total payouts are greater than the total aggregated limits, then the policy is exhausted.
In general, the pro rata approach seems to best capture the wishes of ABT and tenor of the majority opinion. Thus, for the purpose of demonstration, we assume that the claims were evenly distributed throughout the policy period. Since the 1997 Wausau Policy period was 13 months long, it is the most likely period during which ABT might have exhausted its limits. A pro rata allocation would thus result in allocating an amount of $750,605.24 in claims, administrative fees, and costs to the 13-month period ($2,136,338 37 x 13). This amount clearly does not exceed the underlying $2 million per-occurrence limits of the Wausau policy or even the $1 million limit urged by ABT. And if ABT’s payments of claims is the only sum allocated pro rata, ABT paid only $96,831.73 for Foster claims arising during the 1997 coverage period. When this correct calculation is performed, ABT has not exhausted even one-tenth of its underlying coverage in any policy period.
Although ABT concedes that its payments for costs and claims are properly *142 allocated by using the pro rata method, its position would not be improved if we were to apply the total-payments aggregative approach. Under this method, ABT’s total Foster payments, which amount to $2,136,338, are compared to the aggregate of policy limits underlying National Union’s 37-month coverage period.
The underlying insurance provided coverage under the 1997 Wausau Policy of $2 million — $1 million for the 12 months from January 1,1997, to January 1, 1998, and $1 million for the 1 month from January 1, 1998, through January 31, 1998. There was another $1 million of coverage for the 1998 Wausau Stub Policy. And finally there was $1 million self-insured retention from the lapse of siding coverage from the 1998 Wausau Policy, for a total of $4 million.
The parties disagree about whether ABT had $3 million or $4 million in its primary coverage layer 1997 through 2000, but we need not resolve that factual dispute in determining whether ABT exhausted the aggregate value of its primary policies.[1] Even if ABT had only $3 million worth of coverage, it did not make payments of claims — generously interpreted as including costs and fees — exceeding that amount for National Union’s 37-month coverage period. And since, on this approach, ABT failed to exhaust $3 million worth of coverage, it never triggered National Union’s duty to defend using the “all-sums” method.
The majority states with some astonishment that if payment of claims actually means payment of the claims of injured individuals, National Union “likely would never be called upon to defend an insured in a situation such as ABT’s, where its insured has opted to resolve multiple actions in a single settlement of all outstanding claims” or in a situation where there was only one lawsuit, and liability would be assigned at the end of that lawsuit. Far from being an anomaly in National Union’s case, this dynamic is the essence of the excess insurer concept. Indeed, at oral argument, even counsel for ABT conceded that if there was one large case, no duty to defend would attach until after the case was over. What is baffling to the majority is that the excess insurer does not need to “get in the game” until after the primary limits are exhausted. Yet, that is ubiquitously understood in the insurance industry and even by the adverse litigants in this case.
The primary insurer has the primary responsibility for defending claims brought against its insured. It has the primary responsibility for investigating those claims. It has the primary responsibility for paying defense costs, and must do so, in some cases, after its policy limits have been exhausted. Brown, 390 S.E.2d at 155. The excess insurer’s contractual obligation is to pay defense costs and indemnify the insured after the primary insurer’s limits have been exhausted. “Overall, it is the primary insurer’s duty to assume all defense costs. A true excess insurer is specifically intended to come into play only when the limits of underlying primary coverage are exhausted.” Eric Mills Holmes, Holmes’ Apple-man on Insurance § 145.4[B]. Until that happens, the excess insurer is entitled to stand by, because none of its contractual obligations have been implicated. Once the dust has settled, the excess insurer may of course be required to repay the primary insurer for defense costs incurred *143 on its behalf, just as the primary insurer may sometimes have to pay the insured for defense costs expended. This is not an anomaly, but the appropriate division of labor between different layers of insurance. The primary insurer has the closest relationship with the insured and the best facilities for resolving claims. The excess insurance contract is specifically structured to avoid responsibility for these ground-level considerations, and the excess insurer is entitled to rely on its contract. In many cases, that will mean that the insured or the primary insurer will advance defense costs that are later attributable to the excess insurer, which the excess insurer will of course repay. See W & J Rives, Inc. v. Kemper Ins. Group, 92 N.C.App. 313, 374 S.E.2d 430, 434 (1988).
Since no one can plausibly argue that the underlying insurance in this case was exhausted, or indeed has been exhausted, the majority’s view of the case can only be justified if the duty to defend is much broader than the duty to indemnify. Waste Mgmt. of Carolinas, 340 S.E.2d at 377 (“Generally speaking, the insurer’s duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy.”). This is the law for primary insurers. It is not the law for excess insurers. Primary insurers often have to provide a defense before liability is determined. Thus, the duty to defend and the duty to indemnify cannot be coterminous. Excess insurers, however, have different contractual arrangements and different economic functions. When the excess insurer comes on the scene, liability has already been determined. The role for the excess insurer is much more limited — it has not signed up to be in the trenches with the insured, litigating claims. Rather, it makes payments once those claims have entered its layer of coverage.
[I]f during settlement negotiations the primary insurer is allowed to force the excess insurer to cover part of the primary’s insurance exposure, the coverages and rate structures of the two different types of insurance — primary and excess — would be distorted, and excess insurance premiums would have to be adjusted.
Valentine v. Aetna Ins. Co., 564 F.2d 292, 298 (9th Cir.1977). In this case, the contract of excess insurance provides that which is standard in the industry — that National Union does not have any duty to defend until the primary insurance is exhausted by the payment of claims.
The leading treatise makes clear that excess insurance has a very particular function, which is to provide coverage for extremely rare events at an affordable premium.
Umbrella policies serve an important function in the industry. In this day of uncommon, but possible, enormous verdicts, they pick up this exceptional hazard at a small premium. Assuming one’s automobile ... policy [has] liability limits of $1000,000 or even $5,000,000, the umbrella policy may pick up at that point and cover for an additional million, five million, or ten million.
8C John Alan Appleman, Insurance Law and Practice. § 5071.65 (2d ed.1981). Because excess insurance is so inexpensive, insureds should not expect the kind of comprehensive defense and indemnity they receive from their primary CGL policies.[2] *144 Though it is outlandish to the majority that the excess insurer need not pick up the defense tab until the primary limits have been exhausted, that is precisely what the parties contracted for and what they should receive.
The majority, by pursuing a textually indefensible reading of the policy, may succeed by its benevolence in helping the policyholder here. But this decision and others like it will spell a tale of woe for policyholders in the long run. When courts do not enforce contractual language as written, the only way for insurers to stay in business is to raise premiums. The ultimate effect is to make unavailable the inexpensive additional coverage given by excess insurers who can count on reliable judicial interpretations of their policies.
Equally troubling, the majority’s opinion encourages insured parties to pursue the “divide and conquer strategy” apparently employed by ABT in the instant case. ABT, in the Foster litigation, moved all of the siding claims into a private facility for resolution. While negotiating the Foster Settlement process, it negotiated settlements with its insurers, a varying mix of primary and excess insurers covering some 25 years of hardboard siding failures. It did not, however, disclose the amounts of settlements to any of its other insurers. In fact, as it told National Union in this case, it would not reveal the terms of any of its settlements.
The goal of using this method is to extract the maximum possible coverage from the insurers. Because ABT claims that its settlement of the coverage dispute with Wausau exhausted the policy limits, it could claim to National Union that National Union had first-dollar payment obligations on all remaining claims, and that its duty to defend kicked in immediately, even though the underlying limits had not been exhausted in any concrete sense. This strategy carries the attendant risk that ABT will be compensated out of all proportion to its actual losses in the case. Most perniciously, it vastly expands the defense duties of excess insurers, who contracted to act as a backstop if claims exceeded underlying coverage, not to take on the duty to defend as soon as the primary insurer settled a coverage dispute. If the projected claims never emerge in reality, and they may not, then ABT will have realized an incredible windfall of insurance payments without underlying liability.
V
ABT also contends that National Union acted in bad faith and in violation of North Carolina’s Unfair and Deceptive Trade Practices Act, which requires an insurer to act “in good faith to effect a prompt, fair and equitable settlement when its liability became reasonably clear,” see N.C. Gen. Stat. § 58-63-15(ll)(f). ABT argues that the jury had sufficient evidence before it to conclude that “[b]y the winter of 1999, National Union’s liability under its policy was far more than ‘reasonably clear,’ ” and that, rather than settle with ABT, “National Union made a conscious choice, to turn its back on its policyholder and to close its case file in the hopes that ABTco would go away.” And the majority now accepts this view without conducting any analysis of National Union’s duties under the terms of its policy.
Whether National Union violated the provisions of the Unfair and Deceptive Trade Practices Act on which ABT relies depends entirely on whether its liability to defend ABT was “reasonably clear.”[3] *145 Having already concluded that National Union had absolutely no liability to defend ABT in the Foster litigation until ABT had affirmatively established exhaustion of underlying insurance through the payment of claims, ABT’s claim of unfair trade practices with respect to National Union’s failure to settle is readily dismissed. Because ABT had not exhausted its underlying policy limits, National Union was not liable to ABT and could not have violated the Unfair and Deceptive Trade Practices Act by refusing to defend or indemnify ABT.
If it is clear that an insurer had no liability, an action for unfair trade practices cannot go forward. See Rogers v. Unitrim Auto & Home Ins. Co., 388 F.Supp.2d 638, 643 (W.D.N.C.2005) (holding that because the insureds’ “loss was excluded from coverage ... their claim for unfair and deceptive trade practices must also necessarily fail”); Central Carolina Bank Trust Co. v. Sec. Life of Denver Ins. Co., 247 F.Supp.2d 791, 802 (M.D.N.C.2003) (holding that where liability was not “reasonably clear,” insured could not recover on unfair and deceptive trade practices claim).
Since it was reasonably — indeed manifestly- — clear that National Union had no obligation to defend or indemnify ABT, National Union did not act unfairly in refusing to settle. On the contrary, in requesting that ABT supply evidence that it had exhausted its underlying coverage through the payment of claims, National Union acted exactly as was required under the terms of its policy.
Because ABT has presented nothing, even now, that suggests that the underlying insurance policies have been exhausted, the majority points to ABT’s statistician’s report, which suggested that the homeowners’ claims arising from injuries over a 25-year period could reach up to $87.7 million. This forward-looking report was prepared on the basis of numerous assumptions and did not take into account, indeed could not have taken into account, the slowness and difficulty of the claims-resolution facility created by the Foster Settlement, as well as other unforeseeable events. Most egregiously, the majority writes as though $87 million was closely related to the scope of National Union’s liability. Yet, National Union provided insurance for only three years, and then only for damages exceeding the $3 or 4 million level of primary insurance. In using the $87-million figure, the majority overlooks the projection sent out by ABT charging National Union with liability for the three years of at most $3.52 million. Regardless of which projection is used, however, the point remains that the majority imposes on National Union an immediate obligation to begin settlement talks as soon as it receives such projections, which were nothing more than the naked assertion of future liability by the obviously self-interested insured. The majority thus equates potential liability with actual liability.
It is apparently of no moment to the majority that no money had actually been paid on claims; that intervening events had drastically reduced the likely liability; or that no proof of claim had ever been presented to the excess insurer. Indeed, at the time the majority says that National Union “should” have started defending, National Union had not even been provided the terms of the Wausau-ABT settlement of their coverage dispute and so *146 could not have been aware of the payments the majority believes triggered its coverage obligation. All of this makes obvious why the insurance industry, including National Union’s excess policy, requires exhaustion of underlying insurance by the actual payment of claims.
The majority points to the settlements that ABT entered into with other insurers as evidence that settlement talks were appropriate. It does so without one whit of evidence of what the policies of those other insurers said, what information they received, or what claims had been paid that they were responsible for indemnifying. It also ignores the possibility that a wait- and-see attitude is, if not the most polite behavior, contractually justified and legally reasonable.
The majority gives two suggestions for how National Union should have behaved, even if its payment obligation, if any, would only develop years later. First, it suggests that National Union should have conducted an independent analysis of what third-party property damages might be. This suggestion is strange in the insurance world. The filing of a proof of claim, as is required by most insurance contracts, is the duty of the policyholder. To require the insurer to conduct an independent investigation turns this burden of proof on its head. The suggestion also ignores the fundamental division of labor between excess and primary insurers. The majority grafts investigation duties onto the contract of the excess insurer, despite uncontested trial evidence that such investigation simply is not what excess insurers do. As Aimee Tersy testified:
We monitor as an excess carrier. We use the term investigation loosely in this respect. As an excess carrier we don’t go out and investigate claims. We don’t go to plants and see how a product is made necessarily in the beginning because this is something the primary carriers do. They have the responsibility of going out there and doing the leg work, meaning how does this work, what the damages are.
Second, the majority says that National Union “could have advised ABT to wait for the actual costs of the claims in the underlying actions to be ascertained.” This rule is a form of Emily Post jurisprudence, imposing a requirement of communication when there is simply nothing to communicate about. National Union told ABT that they “were working on it and asked for more information.” It is hornbook law that “because an excess insurer has no [first-dollar] contractual obligation to defend its insured, it logically follows that an excess insurer also has no obligation to issue a reservation of rights letter until its contractual duty is invoked.” Eric Mills Holmes, Holmes’ Appleman on Insurance § 145.2 (2d ed.1996). National Union simply had no duty to say anything to ABT until the preconditions to its coverage were met. “An excess carrier owes no duty to the insured nor to the primary carrier either to defend the insured or to enter into settlement negotiations.” Certain Underwriters of Lloyd’s v. Gen. Accident Ins. Co., 699 F.Supp. 732, 740 (S.D.Ind.1988), aff'd 909 F.2d 228 (7th Cir.1990).
Moreover, the majority is flat wrong that National Union did nothing. Uncontested evidence at trial shows that on June 8, 1998, over a year before ABT’s settlement proposal to National Union, National Union sent a letter to ABT which read:
Please be advised that the referenced National Union policy, excess policy, is an umbrella policy. By the terms of such policy, the applicable underlying limits must exhaust before any liability for defense or indemnity may attach. We understand that at the present time *147 underlying coverage has not been exhausted. Therefore, any request for defense or indemnity at this time is premature.
ABT was thus fairly placed on notice that National Union wanted proof of exhaustion. And ABT never contended that National Union was not entitled to exhaustion or that it was National Union’s responsibility to determine coverage before exhaustion.
The majority’s view insists that the insurer constantly indulge its insured with letters, conversation, and consultation, even when no credible coverage has been invoked. Under ABT’s view, it could have asked National Union to do any number of irrelevant tasks, and National Union would have had an obligation to respond. It can cite no authority for this freestanding obligation of social engagement with the insured. In fact, no such obligation is generally understood to exist:
Excess insurance is routinely written in the insurance industry with the expectation that the primary insurer will conduct all of the investigation, negotiation and defense of claims until its limits are exhausted ... Thus, the primary insurer acts as a sort of deductible and the excess insurer does not expect to be called upon to assist in these details. The duty of the primary insurer is not divisible or limited to those suits that are within the policy limits and the insuring agreement creates a duty to defend any suit regardless of the amount claimed against the insured and the excess insurer is a third party beneficiary of that agreement.
7C John Alan Appleman Insurance Law and Practice, § 4682 (1979).
Underlying the majority’s entire opinion is its holding that National Union should have settled the unspecified claims as soon as it received the loss projections from ABT. Surely, this rule should also include a formula for determining “how much?” Embedded in such projections as that given to National Union are a host of factual and legal assumptions, some of great complexity. In this case, the formula would have to include how many houses were damaged? How many people were going to bring claims? How would that vary over time? How did the number of claims depend on the settlement process that was being adopted? How much of the cost of repair could be allocated as property damage? How much underlying coverage was there?
These questions would have to be answered, or at least brought within some rational boundaries, before any meaningful settlement could be discussed. Moreover, while a primary insurer in this case is liable for but a few million dollars, the excess carrier could be liable for as much as $25 million or even $50 million. Under these circumstances, the reasonable rule would be that the excess carrier is entitled to demand real proof that its limits are implicated. As National Union’s claims handler said:
All along I wanted documentation on the damages sustained by the plaintiffs. I had received forecasts, estimates based on a sampling that was conducted, the Sullivan report, but I did not receive documentation backing that information. And it is my job to analyze the documentation and come to a conclusion and I had not received that information, so therefore I could not offer any amount towards a settlement, including the fact, you can add that, too, is the fact that there were exhaustion issues which we needed to determine and clarify before our policy came into play.
The majority’s approach insists that the insurer and the policyholder engage in professional chat even when there is noth *148 ing to chat about. Foisting this obligation on the excess insurer is a brand new rule that imposes completely unexpected and unnecessary costs on the excess insurer, which will inevitably percolate to insureds.
VI
There is no reason to defend National Union’s business manners and sometimes poor business practices. Undoubtedly, it should not have misrepresented to its insured that it needed to purchase a new extended policy when in fact the insured had an adequate policy for the extended period. It probably should have made clear to ABT that it did not agree with the assertions made by a junior associate attorney in his draft of an advisory letter. It probably should have communicated in more detail with its insured. All of these are matters of business courtesy, and, in the case of the misrepresentation, a matter of legal responsibility. Nothing in National Union’s behavior, however, is a basis for forfeiting its benefit in the crystal clear language of its insurance contract with ABT.
The majority’s decision today ignores the straightforward language of the insurance policy governing this case. In doing so, it seriously undermines the expectations of commercial actors who expect to be able to rely on the terms of the agreements they reach. It also strikes a heavy blow against the freedom of contract that underlies a market economy. Finally, it puts in question a long line of our cases resolving contractual issues, in which we have celebrated construing contracts in accordance with then’ terms.
I would reverse the judgment of the district court.

. National Union has conceded that in determining whether it had a duty to defend, the difference between the $3 million and $4 million amounts is irrelevant. Reply Br. at 10 n. 2.

. In this case, ABT paid $72,000 in premiums for the 1997 Wausau Policy, which provided $1 million of coverage for each "Occurrence” and $2 million in the aggregate, whereas it paid only $59,000 in premiums for the National Union Umbrella policy, which provides $25 million of excess coverage for each "Occurrence” and in the aggregate.

. ABT concedes, perhaps unwittingly, that the jury's verdict on the unfair trade practices claim "was based on the fact that National Union failed to attempt in good faith to effec *145 tuate a settlement 'when liability to pay for a part of the Foster claims became reasonably clear.' " Because the jury's premise — that National Union’s liability became "reasonably clear” — was erroneous as a matter of law, its conclusion that National Union engaged in unfair trade practices was equally invalid.